BATES et al. v. DENNIS et al.—203 S. W. (2d) 928.

Western Section.   June 11, 1946.

Petition for Certiorari denied by Supreme Court, January 11, 1947.

Harry H. Elder, of Trenton, for appellants.

Robert P. Adams, of Trenton, for appellees.

ANDERSON, P. J. The bill in this cause seeks to have sold for partition the house and lot in the village of

Eaton, and a tract of 65 2/5 acres of land, both of which were owned by John B. Mayfield at the time of his death intestate in 1908. Both pieces of property are in Gibson County and are about four miles apart.

The complainants contend that they and the minor defendant, Conley F. Graves, are the owners of a one-third undivided interest in the described realty acquired by inheritance from their half-brother, W. Ernest Bates, and that the defendant, Mrs. Hattie Dennis, is the owner of the other two-thirds interest by devise from her husband, R. J. Dennis, deceased.

The defendant, Mrs. Hattie Dennis, contends that her husband, R. J. Dennis, purchased the interest of W. Ernest Bates under whom the others claim, and that she as his sole devisee is the owner of the fee in both pieces of property and therefore none of the other parties have any interest therein. The chancellor sustained this contention and granted that defendant appropriate relief under her cross-bill. The complainants appealed.

The ultimate question for decision is whether complainant's ancestor, W. Ernest Bates, sold or contracted to sell his interest in the two pieces of property to R. J. Dennis, by and under such circumstances as to vest the latter with the legal or equitable title thereto.

The gist of the chancellor's finding is that, "in January, 1909, R. J. Dennis bought and paid for the interest of the said W. Ernest Bates in the said described tracts of land and that if he never executed a deed therefor to R. J. Dennis, as he should have done, his contract, letters, and receipt in his own handwriting were binding on him and estopped him to deny the same."

John B. Mayfield died intestate in Gibson County in 1908. In addition to the two pieces of property here involved, he owned a tract of 110 acres and an interest in

another tract of 211 acres, both in Gibson County. He had no children, and in addition to his widow he left surviving a sister, Miss Julia Mayfield, a sister, Mrs. Vic Mayfield Dennis, the wife of R. J. Dennis, and a nephew, W. Ernest Bates, an only child of a deceased sister, as his heirs at law. The house and lot were set apart to the widow as homestead and the 65 2/5 acres were set apart to her as dower. The widow died shortly before the bill in this cause was filed.

Julia Mayfield devised her property, real and personal, to her sister, Mrs. Vic Mayfield Dennis. The latter willed her property, real and personal, to her husband, R. J. Dennis. After her death R. J. Dennis married the defendant and cross-complainant, Mrs. Hattie Dennis, and upon his death in October, 1938, devised and bequeathed his property, real and personal, to her. The complainants are the half-brothers and sisters on their father's side of W. Ernest Bates, and claim through him by inheritance.

W. Ernest Bates was somewhat of a wanderer. Upon the death of his mother, his father re-married. The son was not then grown. Being unable to live agreeably with his step-mother, he left home and after staying a time with the Mayfields in the village of Eaton in Gibson County, he departed from that place and about 1907 went to work on a barge or dredge plying between Saint Louis and Memphis on the Mississippi River. At some period of time Bates made his headquarters in Memphis. He appears to have been a spendthrift and became, according to one of the witnesses, "a regular old steamboat bum," who "ran through with money as fast as he could get it." The evidence indicates that he met his death by drowning in 1930 or 1933, but none of his relatives seem to have made any inquiry about it, and so far as they knew his body was not recovered.

The 110-acre tract was sold by the heirs of John B. Mayfield, including W. Ernest Bates, to J. M. Morgan, on or about August 11, 1908, for the consideration of $1100 payable $325 cash and the balance in two notes each for $387.50 due November 15, 1909, and November 15, 1910. In October, 1908, the same heirs sold their interest in the 200-acre tract to H. C. Hall and wife for the consideration of $3240 evidenced by three notes dated October 1, 1908, one for $1500 due December 15, 1908, one for $870 due November 15, 1909, and one for $870 due November 15, 1910. W. Ernest Bates owned a one-third interest in each of the notes given for the deferred purchase money payments on the two tracts of land.

It appears therefore that all of the land of which John B. Mayfield died seized and possessed was sold before November, 1908, except the homestead and dower tracts here involved. So far as is shown, W. Ernest Bates on that date had no interest in any other land.

The cross-complainant, Mrs. Dennis, introduced in evidence a letter proved to have been in the handwriting of W. Ernest Bates and in an envelope addressed to R. J. Dennis, bearing a Memphis postmark dated December 16, 1908. This letter is in the following language: "Dear Sir. Received your letter a day ago. Glad to hear from you Send me $200.00 and I will sell you my share of the place. I will send you receipt.

"I received of R. J. Dennis $200.00 for my share of the Mayfield estate

"W. E. Bates.

"Address 318 Franer and Delaware."

It is also proven that enclosed with this letter was a note written with pencil in the handwriting of W. Ernest Bates:

"Send it rite away to Carruthersville in care of U. S. Venus  Send a bank check  how is everyone  give my love to all.

"Earnest"

There was also offered in evidence a receipt in the handwriting of W. Ernest Bates, dated January 9, 1909, in the following language:

"I received of R. J. Dennis $331.21 for my share of the John B. Mayfield estate.

"W. E. Bates."

It appears that after Bates had sold his interest in the other tracts, R. J. Dennis received a letter from him regarding his remaining interest, and that in response to this letter Dennis went to Memphis to see Ernest Bates. Upon his return he told several of the result of his trip, but what he said was excluded by the chancellor on objection of the complainant.

One of the witnesses testified that this trip was made in 1907 or 1908, "somewhere along there," and when pressed to be more definite as to the date, he said, "All I know is that what he told me was what he was going to Memphis for and what he done after he got there."

It is also shown that R. J. Dennis kept deeds and papers of a like nature in his trunk at home. He kept his notes and insurance premiums and letters and the receipt from W. Ernest Bates in a private box in the bank. His home burned in 1930, destroying his trunk and papers. In 1932 the bank was liquidated and he obtained and kept his private box wherein the letters and receipt introduced in evidence were found.

The complainants proved that over a considerable period of time W. Ernest Bates expressed a great dislike for R. J. Dennis assigning as a reason therefor that Dennis had not been fair to him in dealings. So far as direct-

ly appears, the only transactions between the two were those represented by the letters and receipts herein quoted.

A sister of Bates testified without objection that while on visits to her home after the receipt was executed, with respect to the property here in question he "often said that he still owned it, if he ever went back, he would have it."

None of the complainants made any claim to the property until they or some of them were requested to execute some papers for the purpose of clearing up the title. This resulted in the employment of their present counsel to conduct an investigation, which in turn resulted in the filing of the bill by the complainants asserting their rights.

So far as appears, however, they had not been previously informed that the defendant, Mrs. Hattie Dennis, claimed the property and had no occasion to assert any rights thereto prior to the time the investigation was made.

If there was a valid executory contract between Bates and Dennis, for the purchase and sale of the property, then in the eyes of equity the ownership passed to Dennis even though no deed was executed. In that event Bates would hold the legal title upon a naked trust which would follow it into the hands of his heirs. In other words, the vendee's equitable estate avails against the vendor's heirs, and devisees. The applicable doctrine is to be found in the maxim that equity regards that done which ought to have been done. Hence, if such a contract be proven, there can be no doubt about the jurisdiction of equity to grant the relief decreed by the chancellor. Pomeroy's Equity Jurisprudence, Vol. I, Secs. 105, 368, 372.

The cross-complainant, Mrs. Hattie Dennis, contends that the letter of December 16, 1908, constituted an offer to sell the writer's interest in the property in question, and that the receipt dated January 9, 1909, considered in the light of the circumstances, was sufficient proof of an acceptance of that offer to make a valid executory contract of sale. The complainants vigorously combat this view and insist, first, that the evidence does not warrant the conclusion that the transaction evidenced by the receipt was the same transaction proposed in the letter; and, second, that if it be held otherwise, with the result that the offer in the letter must be regarded as having been accepted, the agreement thus consummated was ineffectual to transfer an interest in the property because of its uncertainty, especially with respect to the description of the subject matter.

It cannot be doubted that a valid enforcible contract may be created by the oral acceptance of a written offer to sell real property. Nor, for that matter, can it be doubted that where there is no plea of the statute of frauds a parol sale of real property is valid. But in either event, to be effective, the contract proven must be reasonably certain as to all of its essential terms. This is no less true of executory contracts than of executed ones, such as deeds. As to the latter, it is tersely stated in Phoenix, etc., Ins. Co. v. Kingston Bank & Trust Co., 172 Tenn. 335, 338, 112 S. W. (2d) 381, 382, that "A valid deed must designate the land intended to be conveyed with reasonable certainty." See, also, Sheid v. Stamps, 34 Tenn. 172; Southern Bldg. & Loan Ass'n v. Rodgers, 104 Tenn. 437, 58 S. W. 234.

In practical effect this suit in the aspect before us is one for specific performance of a contract for the sale of real property. For such relief there is demanded "that

degree of certainty and definiteness which leaves in the mind of the chancellor or court no reasonable doubt as to what the parties intended and no reasonable doubt of the specific thing equity is to compel done.'' Pomeroy's Eq. Jur., Vol. 5, Sec. 2186. Among other essentials, ''the land or other subject matter must be described with sufficient definiteness to identify it, with the aid of such parol evidence as is properly admissible to apply the written description. Thus, a contract to convey 'your lot' where the vendor owned three lots is not enforcible and parol evidence cannot be brought in to show the intent of the parties as to one particular lot. But, to give the classic instance, a contract to convey 'my mill' where the vendor owned but one mill is good.'' Ibid., Sec. 2189; Gibson's Suits in Chy., Sec. 949; 49 Am. Jur. 135; see also 12 Am. Jur. 544 et seq.

In the leading case of Dobson v. Litton, 45 Tenn. 616, 620, the rule is stated as follows:

''Where an instrument is so drawn that, upon its face it refers necessarily to some existing tract of land, and its terms can be applied to that one tract only, parol evidence may be employed to show where the tract so mentioned is located. But where the description employed, is one that must necessarily apply with equal exactness to any one of an indefinite number of tracts, parol evidence is not admissible, to show that the parties intended to designate a particular tract by the description.''

The agreement under consideration in that case was as follows:

''I have this day sold to W. K. Dobson a certain tract of land, containing nine acres and sixty-six poles, near the junction of Broad Street, Nashville, and the Hillsboro Turnpike, Davidson County, Tennessee, for the sum of four thousand dollars.''

It was held that this agreement was too vague and uncertain to be enforced in that it did not point out and identify the premises and that the defect was such as that it could not be remedied by parol proof. The rule applied has been many times re-affirmed. See Kirshner v. Feigenbaum, 180 Tenn. 476, 176 S. W. (2d) 806, and cases cited.

Guided by this rule and presupposing for the moment a consummated agreement, we are unable to escape the conclusion that the subject-matter is not sufficiently identified to make the agreement effective to transfer an interest in the property. Assuming that the receipt was sufficient evidence of an acceptance of the offer contained in the letter of December 16, 1908, and construing the two together, an analysis shows that the offer was to sell for $200 "my share of the place." The receipt which the writer says he will give if the offer be accepted is one for $200 "for my share of the Mayfield estate." The receipt shown to have been executed and which it is alleged constituted an acceptance of the offer is for $331.21 "for my share of the John B. Mayfield estate." Hence, it is apparent that the property described in the offer as "the place" was one identified with "the Mayfield estate," and a place which the offerer did not own entirely but owned "a share." As already said, the extrinsic proof shows that at the time the offer was made the only real property identified with the Mayfield estate in which Bates had an interest were the two tracts here involved. As his interest was an undivided one, the reference to it as "a share" was not inapt.

So there would be much force in the defendant's position if, at the time the contract was alleged to have been made, Bates had owned an undivided interest, or "a share," in only one piece of property identified with the

Mayfield estate. But such is not the case. He owned a one-third undivided interest in two places, both of which were equally connected with the Mayfield estate but were four miles apart, and otherwise separate and distinct.

In describing what he offered to sell, the writer used the singular, that is, "my share of the place," not "my share of the places"; and there is no evidence in the record, written or parol, warranting a conclusion with respect to which of the two he referred. Other questions aside, to sustain the defendant's position, we would be obliged to change Bates' language from the singular to the plural. This, we think not warranted under the record before us.

We conclude therefore that if it be assumed that Bates' offer was accepted, the resulting contract was too uncertain in its terms to be effective as a transfer of an interest in real property.

But we are also of the opinion that the proof was insufficient to show that the offer in Bates' letter was accepted. The pertinent rule is: in order to form a contract, the offer and acceptance must express assent to one and the same thing. There must be no variation. Thus it is said that in order that a binding and enforcible contract may arise out of the doing of an act in consequence of an offer, the act must be done in accordance with the terms and conditions of the offer. 12 Am. Jur. 543, 544; 13 C. J. 281; see also 17 C. J. S., Contracts, Sec. 43; Canton Cotton Mills v. Bowman Overall Co., 149 Tenn. 18, 31, 257 S. W. 398; Petway v. Loew's Nashville & Knoxville Corporation, 22 Tenn. App. 59, 117 S. W. (2d) 975, 982; Armistead v. Tenn. Consolidated Coal Co., 14 Tenn. App. 434, 443, 446; Coate v. Tigrett, 4 Tenn App. 48.

The evidence relied upon to show an acceptance of the offer consists solely of the receipt shown to have been in

Bates' handwriting; the proof that Dennis went to Memphis to see Bates along about the time the receipt bears date; and the circumstances that the only "places" in which Bates had an interest, which can be said to have been identified with the Mayfield estate at the time the receipt was executed, are the two here involved.

We think that after the long lapse of years this evidence leaves the matter involved in too much uncertainty to permit the conclusion that the particular agreement was consummated. There are too many things left wholly unexplained.

As said, prior to the date of the letter containing the offer of sale, the heirs of John B. Mayfield, including Bates, had sold the other real property inherited from Mayfield, and at that time jointly owned the deferred purchase money notes taken in connection with said sales, aggregating in principal $4015, of which Bates' share was $1338.33, exclusive of interest. It is not shown when any of the deferred purchase money notes were paid; but one, dated October 1, 1908, for $1500 was due December 15, 1908, one day before the letter containing the offer was dated and some three weeks before the receipt was dated. It appears that in a proceeding in the County Court apparently to set aside homestead and dower, a subpoena to answer was issued for W. Ernest Bates, directed to the Sheriff of Shelby County. Service was accepted by Bates on May 27, 1908. His acceptance was accompanied by a letter advising that he could not attend court at the time required but that "I left my part of the bisness with R. J. Dennis enything he agree on is satisfatly to me." The record also discloses that Dennis, as the true and lawful holder of the claim, executed a release of the lien securing the deferred purchase money notes given in connection

with the sale by the heirs of John B. Mayfield of the tract of land to J. M. Morgan for a consideration of $1100.

Whether Dennis held the notes as owner or as agent for the payees including Bates does not appear, but these facts, considered with the other circumstances, furnish some basis for an inference that Dennis was handling for Bates the latter's affairs in connection with the Mayfield estate during his absence from Gibson County.

Considering the wholly unexplained discrepancy between the amount for which Bates offered to sell his interest and the amount of the receipt, together with the other circumstances, we think that at this late date it is as reasonable to conclude that the receipt related to some amount which Dennis had collected for Bates as it is that it related to the offer of sale made by the latter.

Indeed, if Dennis handled the sale to Morgan for a consideration of $1100 and purchased Bates' interest in the deferred purchase money notes, as his release of the lien rather indicates, and then settled with Bates for this and his share of the amount of the purchase price paid in cash, the net amount due Bates, allowing for a discount on the notes and expenses of the transfer, would not be far from the amount of $331.21, for which Bates executed the receipt.

Or, considering cross-complainant's evidence that Bates frequently borrowed from his relatives, including Dennis' wife, it is not beyond the realm of possibility that the receipt evidenced Bates' share of the $1500, note, which fell due shortly before the document bears date, less some amount which Bates owed Dennis or his wife.

A small but pregnant circumstance indicating that the receipt related to some such settlement rather than to Bates' offer to sell, is that instead of being for a round sum, as was that contained in the offer, the receipt is for

a sum containing not only odd dollars but odd cents, to-wit $331.21. Having regard to common experience, it is hardly probable that if negotiations subsequent to the offer resulted in Bates' raising his price from $200, the amount arrived at would contain such fractional sums. It is of course possible but, as we say, it is certainly not probable. Upon the contrary, as said, we think the amount of the receipt indicates that it was more likely a division of a round sum, as would naturally be required in an accounting of a sum collected and belonging to more than one person.

Moreover, if we should accept the defendant's theory, we have the anomalous situation of an offer to sell one-third interest in two pieces of property for $200 and the payment by the offeree of $131.21, more than the owner offered to take, without any explanation of the discrepancy. The receipt does not fit the terms of the offer.

As having a bearing upon the probability of the defendant's contention, it is argued that Bates is shown to have been a spendthrift, eager to dispose of his property, and that he annoyed his relatives with demands for money. Presumably, we are asked to draw the inference that Bates was anxious to dispose of his interest in the two pieces of property and willing to do so at a sacrifice. This theory, even if it were relevant, lacks plausibility. Whatever may have been Bates' general propensity with respect to getting rid of his property, his letter shows that the negotiations resulting in the offer were initiated by one written by Dennis to Bates, the contents of which are not shown. The fact that Bates' offer concluded with a proposed receipt for $200, considered in connection with the note enclosed therewith, indicates that Bates expected Dennis to send him a bank check for $200 to Carruthersville in care of the "U. S. Venus." Why, instead of doing

this, Dennis went to Memphis and instead of $200, paid $331.21, if he did so, is a material discrepancy which, as said, is unexplained.

There are other unexplained circumstances that leave the proof in an unsatisfactory condition. One is the alleged loss of the deed that Bates is supposed to have executed. As said, while there is no direct proof of the fact, we are asked to infer that the deed was lost when Dennis' house burned. The basis of the claimed inference is the proof of the fact that Dennis customarily kept deeds in the trunk in his home, whereas he kept insurance policies and receipts in a lock box at the bank. Why he would show less care about a deed, and especially an unrecorded deed, over a long period of years, than he did about receipts, is not explained.

Again, the house burned in the early part of 1930. Dennis died in October, 1938. If Dennis had a deed and it burned, he knew it, and he also knew it was unrecorded. Nevertheless, during the some eight years that he lived after the house was destroyed he took no steps whatever, so far as appears, to have the lost deed supplied.

■ Moreover, as said, the complainants prove by Bates' sister that after the date of the receipt, and upon an occasion Bates was visiting in her home, he said that he still owned his interest in the property and that ''if he ever went back there he would have it.'' Whether this evidence was competent is not in question, for there was no objection to it on the trial and no complaint is made here of its admission. Hence it is to be considered for what it is worth, however little. Ehrlich v. Weber, 114 Tenn. 711, 88 S. W. 188; Province v. Interstate Bldg. & Loan Ass'n, 104 Tenn. 458, 461, 58 S. W. 265; Smith v. Fisher, 11 Tenn. App. 273, 286.

Upon the whole case, considering the long lapse of time and the fact that all of the immediate parties to the alleged transaction are dead, and the further fact that the contract sought to be established is one transferring an interest in land, we think the evidence leaves the question involved in too much doubt and uncertainty to warrant the conclusion that the determinative facts are shown by the requisite degree of proof.

The result is that the decree of the chancellor is reversed and a decree will be entered here in accordance with the views herein expressed. The cause is remanded to the chancery court for further proceedings. The cost of the appeal will be paid by the defendant, Mrs. Hattie Dennis, and the cost of the chancery court as decreed there.

Ketchum and Baptist, JJ., concur.